### No. 23,108.

THE CITY OF LEAVENWORTH, *Appellee*, v. THE GREEN RIVER ASPHALT COMPANY and UNITED STATES FIDELITY AND GUARANTY COMPANY, *Appellants*.

#### SYLLABUS BY THE COURT.

1. PAVING CONTRACT—*Terms of Guaranty Bond Construed.* The paving contract and bond involved herein are examined, and held to guarantee the pavement for ten years only as to the character of the material and workmanship furnished by the contractor, following *Kansas City v. Hanson*, 60 Kan. 833, 58 Pac. 474.

2. SAME—*Making of Certain Repairs by Bond Company—No Estoppel.* The fact that certain repairs were made by the defendants some nine years after the completion of the work held not to estop them from maintaining the defense urged by them indicated in the foregoing paragraph.

3. SAME—*Action for Damages—Statute of Limitations.* The action is held to be one on a written contract to keep the pavement in repair for ten years, and having been begun within five years from the expiration of that period it was not barred.

Appeal from Leavenworth district court; WILLIAM A. JACKSON, judge *pro tem.* Opinion filed April 9, 1921. Reversed.

*W. L. Wood, J. E. McFadden,* both of Kansas City, and *Lee Bond,* of Leavenworth, for the appellants.

*C. F. W. Dassler,* city attorney, *W. W. Hooper,* and *C. P. Rutherford,* both of Leavenworth, for the appellee.

The opinion of the court was delivered by

WEST, J.: The city sued the asphalt company and the bonding company for damages arising out of a paving contract entered into in September, 1902, alleging a violation of that portion providing for maintenance of the work. The city recovered, and the defendants appeal and assign as error certain findings of fact and conclusions of law; the failure to make certain requested findings and conclusions; the overruling of a motion for judgment on the findings; the refusal to set aside the findings of fact and conclusions of law made by the court; and the denial of a motion for a new trial.

The contract provided among other things that if sheet asphalt be used it must be as good as the best quality of Bermuda lake, pure Trinidad lake or Buena Vista asphalt, and if American bituminous rock, it must be as good as the best quality of asphalt mined at the Buckhorn mines in the Chicasaw Nation or that mined in Breckenridge county, Kentucky.

### "GUARANTEE.

"SECTION 28. The contractor guarantees that the pavement laid shall be of such material and with such workmanship that the pavement shall be and remain in good repair and free from all settlements, defects and damages due to the use of defective material and workmanship or the proper use of the street as a roadway or the actions of the elements for the full term of ten years. . . . In addition to the requirements of the general specifications during the period of maintenance whenever any section of the pavement disintegrates or shows waves in the surface due to creeping and rolling, the asphalt and binder shall be cut to the concrete and repaired with new asphalt and binder laid as specified herein. . . . If it is found necessary in any three hundred lineal feet of pavement to repair any more than one-third of its area, or if the lineal feet of cracks in any section of the pavement exceed the proportion of one lineal foot of cracks to four square feet of pavement then shall the entire wearing coat in such defective section be cut out to the concrete and new asphalt and binder laid as above. All cracks three-eighths of an inch or more shall be considered disintegration."

The bond provided—

"That the paving, and work under the terms of this contract shall be

City of Leavenworth v. Asphalt Co.

of such material and such workmanship, that the same shall be and remain in good repair, and free from all settlements, defects and damages due to the use of defective or imperfect material, or poor workmanship, or the proper use of said streets and alleys as a roadbed, or to the action of the elements, for the full term of ten (10) years from and after the acceptance of said work; that all imperfections, settlements, defects, or damages in any portion of said work occurring at any time during the said period of ten (10) years from and after the acceptance of said work by the city engineer and mayor and council, shall be promptly repaired by the said party of the first part. . . ."

The petition alleged that the contractor did not use the required kind of material, but an inferior kind; that on account of poor material and workmanship the pavement did not remain in good repair—

"And at the expiration of ten years from the completion and acceptance of said work was, and now is defective and out of repair to the extent of about one-half of the entire surface of said street, due to said defective and imperfect material, poor workmanship, the proper use of said street as a roadway and to the action of elements and not to any other cause or causes."

The second amended answer of the guaranty company alleged that the quality of the material contracted for was used and approved and accepted by the city engineer, and averred that if the work did not remain in good repair for ten years it was entirely the fault of the city in specifying the use of improper material and the improper laying thereof, and that the plans were imperfect and defective in that the material specified and the workmanship required were such that—

"The pavement when completed under the terms and conditions of said contract and specifications would not endure for the ten-year period. . . . ; all of which was well known, or with reasonable diligence could have been known to the plaintiff, but was not known to this defendant until subsequent to the filing of this suit. . . . ; that the defendant, . . . was bound, hand and foot, to the plan of the plaintiff; that it had no discretion as to the material to be used or the manner in which the work should be done; that it was an impossibility . . . to construct the pavement according to the terms of said contract and specifications and at the same time produce such a pavement as the defendant (plaintiff) required; and said . . . company was, therefore, not to keep said pavement in repair, as against the defective plans prepared by the plaintiff in said contract, or any part thereof."

Also, by the terms of the contract it was bound to make such repairs only as became necessary on account of indifferent workmanship or defective material used:

"It was only a guaranty by the contractor of the quality of material used and the character of the work performed by said contractor."

The second amended answer further alleged that the city permitted many cuts to be made by plumbers, causing great damage to the pavement. To this the plaintiff replied that such cuts were made to lay and repair water and gas pipes—which cuts the contractor was to replace and repair. The defendants also pleaded an upheaval caused by the bursting of a water main for the repair of which they alleged they were not responsible.

The court made thirty-three findings of fact and four conclusions of law. Among the former were those to the effect that the company contracted to lay asphalt upon the old macadam base then on the street; that the city supervised and accepted the work; that the asphalt used was of the kind set forth in the contract; that the city engineer stated in his final estimate that the contract had in all respects been complied with; that during the ten-year period 200 square yards of pavement were cut by plumbers, licensees of the city, many of such cuts being permitted to remain open during summer and winter seasons and at times to become filled with water and snow, some of them being repaired by the defendants; that a portion of the pavement which was laid on a granite block base suffered no damage; that no contract provision relative to the use of concrete and binder course was followed in the construction of the pavement, and that the agreement to "cut to the concrete" meant to "cut to the base." It was further found that the old macadam base was not a proper base to secure the best possible results—

"That is to say, a better and more proper and suitable base could have been applied and used, and if a more suitable and stronger and heavier base had been used, better results would have been attained for that the macadam base so used was not stable but would give, move and yield when heavy traffic was moving over the surface of the street which caused the base to spring, yield and give away, thereby causing the wearing surface to spring, yield and crack and water was caused to run in such cracks and to percolate in through said macadam foundation and asphalt wearing surface into and under the macadam base and as a result thereof said base became softened and the traffic upon said street, and the use of the street, caused it to settle in places and rise in other places and the movement of heavy loads and traffic on the street caused the base to give way and the wearing surface thereof to crack

City of Leavenworth v. Asphalt Co.

and thereafter rapidly to deteriorate and become defective and in need of repair."

It was also found that the plumbers' cuts were permitted to remain open during winter seasons and to be filled with loose rocks, and water ran into the cuts and percolated through and under the base and between the base and the wearing surface, causing the base to become softened so that traffic would cause the base to move and spring and the surface to crack and break. The drainage caused by the bursting of the water main was found to have been repaired by the paving company. While heavy traffic came over the pavement from the fort it was found to be no heavier than customary. It was found that within two years from the completion of the work the surface began to crack and that this increased perceptibly during the rest of the ten-year period, to the knowledge of the city. There was a finding that during 1911, the bonding company at the request of the city made certain repairs, costing $3,149.63. The thirtieth finding was that on January 25, 1914, there were fourteen 300-foot sections, more than a third of each of which was defective and in need of repairs under the terms of the contract, but from this should be deducted 2,057 square yards destroyed by the bursting of the water main. The thirty-third finding was that at the expiration of the ten-year term—

"The asphalt pavement on said street was in a very defective condition and out of repair to the extent heretofore indicated and such defects and condition are due to the proper use of said street as a roadway and the action of the elements."

As matters of law it was concluded the bond required that the pavement should remain in good repair and free from all defects and damages due to the use of defective material and workmanship, or the proper use of the street as a roadway, or the action of the elements; that the defendants are liable for failure thus to maintain and keep in repair—the amount due from the bonding company being $24,571.63, with interest and costs.

The defendants' counsel frankly say that the only question presented is the meaning of the words "or the proper use of the street as a roadway or the action of the elements." They argue that the contract and bond simply insured the character of

the material and workmanship furnished by the company, and that as the court found in the defendants' favor on these matters, they are entitled to prevail. This is, indeed, the pivotal point in the case.

Section 28 of the contract, already quoted, brings the case fairly within the decision in *Kansas City v. Hanson,* 60 Kan. 833, 58 Pac. 474. There the contract first bound the contractor to keep in repair five years, but after the comma following the clause, came another:

" 'And binds himself, his heirs and assigns, to make all repairs which may, from any imperfection in said work or material, or from any crumbling or disintegration of the material, become necessary within that time. . . .' " (p. 834.)

It was held that the two clauses considered together covered simply such repairs as might become necessary through imperfect work or material.

The trouble appears to have arisen from a poor base, a lot of plumbers' cuts left open and admitting rain, and continued neglect, save in one or two instances, to make any effort to keep in repair. In other words, the pavement contracted for was laid, and the proper material, to be furnished by the company, was used, but owing to the character of the base on which this material was laid, and owing to the effect of the plumbers' cuts, use of the pavement and the action of the elements rendered it defective and insufficient.

*Cameron-Hawn Realty Co. v. City of Albany,* 119 N. Y. Supp. 128, involved a maintenance contract very similar to the one under consideration. The city prescribed the materials to be used and superintended the work, and it was held that the plan prescribed by the city was defective, which plan, fully executed, was insufficient to keep the pavement in repair. It was said that the contractor "had no discretion as to the material to be used or the manner in which the work should be done." (p. 130.) It was therefore held that the guaranty simply meant that the city's plan should be followed.

Chicago let a paving contract and after its completion permitted a street-car company to put down much heavier rails and run heavier cars along the street than formerly, which injured the pavement, and the paving company was absolved from liability under its maintenance guaranty. (*Conway Co. v. City of Chicago,* 274 Ill. 369.) The court said that when

the contract was made no one connected with it had any reason to anticipate that the vibration of the rails would damage the pavement. The contract stated that—" 'as a guarantee of the faithful performance of these specifications, the quality of the material furnished and the proper construction of said improvement, the contractor hereby agrees to keep and maintain . . .' " (p. 371); and it was held that the paving company was not liable.

Counsel cite *Cole v. The People*, 161 Ill. 16. There the provision was that a bond should be furnished—"as a guarantee . . . that he will . . . keep in continuous good repair all pavement laid under this contract for a period of five (5) years . . ." (p. 19); and this was said to be "merely a warranty or guaranty of the fitness of the material for the use intended." (p. 20.)

The statute of limitation is invoked on the theory that the city treated the defective condition as a permanent damage from the time the pavement began to crack and the failure to repair, as it had a right to do for more than two years, and, therefore, this action is barred. Numerous decisions are cited to the effect that permanent injury to real property must be sued for within two years. But this is not an action for permanent damages to real estate. It is one under a written contract covering a ten-year period which expired January 25, 1914. (Gen. Stat. 1915, § 6907, subdiv. 1; *Grisham v. Lee*, 61 Kan. 533, 60 Pac. 312; *Jewell v. Trust Co.*, 103 Kan. 381, 173 Pac. 923; *Lingren v. Fletcher*, 8 Kan. App. 376, 56 Pac. 328.) While the record does not show when the petition was filed, the second amended answer was filed May 17, 1915, which was well within the statute of limitation.

The paving company, of course, knew the character of the base furnished by the city, but so did the city, and the language of the contract and bond indicates that all parties were acting on the assumption that the contractor was to use the kind of material and furnish the kind of work specified, but not to be liable for defects in the completed work brought about by the insufficient character of that part contributed by the city—the base.

While finding No. 33 is to the effect that the defective condition was caused by the use of the pavement as a roadway and

the action of the elements, those numbered 12 and 14 clearly assign the bad base and plumbers' cuts as the cause, and the evidence supports the latter rather than the former.

The fact that certain repairs were made in 1911, amounting to several thousand dollars, does not in our judgment estop the defendants from urging the defense insisted upon by them.

The record showing that the defendants ought not to be called on to make good the pavement, the judgment is reversed and the cause remanded with directions to enter judgment in their behalf.

WEST, J. (dissenting) : The contractor fully understood that the pavement was to be laid on the macadam base furnished by the city, and it undertook to perform a task which it knew, or ought to have known, could not be successful by reason of the insufficient foundation furnished by the other party. It was, no doubt, considered by all concerned that the work would last much longer than ten years, but a guaranty and bond were required for that length of time which it seems would hardly have been given or received had any of the parties known or believed the work was to be paid for, although shortly, by reason of a bad foundation, to become defective. It is much like the situation in the *City of Akron v. Barber Asphalt Paving Co.*, 171 Fed. 29. There the damage was caused by the city permitting a street-car company to put on heavier equipment, and it was said:

"Clearly, then, the parties had the subject of street car tracks in mind. . . . Indeed, the paving company furnished and mixed the materials for the track foundation; . . . It was the duty of the paving company, then, either to insist upon having the contract provide against performance of the covenant of guaranty in any case of imperfect tracks or track foundation, or to make good its covenant in the form adopted." (pp. 36, 37.)

In *Barber Asphalt Paving Co. v. City of Louisville*, 123 Ky. 687, the company contended, as here, that it was liable only for defects in material or workmanship. The damage was caused by leakage of gas mains. It was said in the opinion that when the contract was made there were gas mains under the street to the knowledge of the parties—

"And, this being true, it is to be presumed that the guaranty as to repairs contemplated the making of repairs resulting from such leakage,

as well as those caused by the use of the street from travel and exposure to weather." (p. 694.)

The testimony showed that cracks extended entirely across the street, some wide, some narrow, and that in driving with a horse or a car one had to dodge from one side to the other to avoid them. In the Hanson case a general guaranty provision was held to be limited by a restricted clause which controlled the instrument. Here, the reverse is true. The first part of section 28 refers to defective material and workmanship and the next sentence provides that in addition to the requirements of the general specifications, whenever any section of the pavement shall disintegrate or show waves the asphalt and binder shall be cut to the concrete and repaired with new asphalt and binder laid as specified therein. The court expressly found that this meant to cut to the base and that no attention whatever was paid to this clause by the company, and also:

"If it is found necessary in any three hundred lineal feet of pavement to repair any more than one-third of its area, or if the lineal feet of cracks in any section of the pavement exceed the proportion of one lineal foot of cracks to four square feet of pavement then shall the entire wearing coat in such defective section be cut out to the concrete and new asphalt and binder laid as above."

The bond, after mentioning the conditions of the specifications and the contract "which are here referred to and made a part hereof," provided that whereas—

"Said . . . Company did undertake and agree to keep and maintain the said paving of said Broadway as herein mentioned, and as in said contract and specifications provided, for the full period of ten (10) years, . . . Now, therefore, if the said . . . Company shall well and truly perform its said agreement and shall maintain the aforesaid street in good condition as provided in said specifications and contract, and shall otherwise comply with the terms and conditions of said contract and specifications in regard to the maintenance of the work, . . . then this obligation shall be void, otherwise to be and remain in full force and effect."

What all this language was used for unless it meant what it said is beyond my comprehension. It would have been no trouble at all to word a contract and a bond so as to provide clearly beyond all question merely for defects of workmanship and material, and to my mind, it would have been difficult to provide much more clearly than was done, for repairing the

defects found by the court to exist. Further, unless the defendants so understood the contract and bond, I can find no explanation for their doing over three thousand dollars' worth of repairs nine years after the pavement was laid, which appears to be a construction, by the parties, of the contract and bond they had entered into.